UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Alton Jones, Jr. | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 15 CV 8986 |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Alton Jones, Jr. brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits. This is his second appeal to this Court, and this Court again finds that a remand is required.

## **BACKGROUND**

Plaintiff filed his disability applications on July 9, 2009. R. 22. A hearing was held before an administrative judge on April 5, 2011. R. 39. On May 25, 2011, the ALJ found plaintiff not disabled. Plaintiff appealed that ruling, and this Court ordered a remand. R. 667-697.[1]

On January 29, 2015, the same ALJ held a second administrative hearing. Plaintiff testified that he had five children under 18 years old, that he lived in an apartment with his girlfriend (who was the mother of plaintiff's 8-week old son), and that he finished school through the ninth grade. Plaintiff testified that he had difficulty concentrating and had crying spells a few times a week. When the ALJ asked whether he had any thoughts of harming himself, plaintiff stated "[n]ot at this time." R. 582. When the ALJ asked whether plaintiff had any hallucinations,

---

[1] In this appeal, neither side has raised any argument relating to the ALJ's first decision or to this Court's first remand decision. This Court therefore has only considered the arguments presented in this current appeal.

delusions, or paranoia, plaintiff stated the following: "In the past I was dealing with the paranoia situation with the Elgin police department. I just had a lot of troubles with them." R. 582.

Plaintiff testified that he did not sleep well and takes 300 milligrams of Seroquel to help with the problem. He estimated that he got about four hours of sleep a night and usually did not nap. He testified that he did not shower daily and could not explain why he did not do so more frequently. He did not drive because he has a suspended license. He testified that he was able to put dishes in the dishwasher, that he did not do laundry (although he was able to), that he did not make his bed daily, that he "seldomly" helped with vacuuming and dusting, and that he is able to take out the garbage. R. 585-86.

The ALJ next asked about his role in taking care of his infant child who was living with plaintiff and his girlfriend. Plaintiff testified that he was able to change a diaper, feed the child, or make a bottle if needed. When asked specifically what he did, plaintiff stated as follows: "The times I have him is while his mom is sleeping so from like two or three in the morning until maybe seven in the morning I'll have him and then she'll leave for work, her mom or sister will come over and help me with the baby." R. 586.

Plaintiff testified that he mostly watched television at home, and that he and his girlfriend went out to eat about once a month. He did not attend church or read. He had an email account "from years ago" but did not check it because he did not have a computer. R. 587-88. He had a cell phone which he used to text his girlfriend.

The ALJ noted that plaintiff had testified about not getting along with others and asked him to "give an example of a time [he] had an issue with a co-worker or supervisor." R. 590. Plaintiff explained as follows:

> Yeah, I was at work. I worked at a warehouse on a cherry picker and my safety
> harness came unraveled and when I took it to the supervisor he told me since it

unraveled when I was using it that I should pay for a new one. Well that put me in a bad mood and I took the harness and I lost my temper and I threw the harness at him and I left.

R. 590. The ALJ asked plaintiff about an incident in 2005 when he went to the emergency room and was "threatening the staff" and was "violent." R. 591-92. Plaintiff stated that he was having trouble and had been drinking and that the staff was not being helpful and so he "lost [his] temper" and "pulled the IV out of [his] arm, grabbed [his] clothes and [] walked out." R. 592. The ALJ asked plaintiff about why he was referred to a domestic violence problem in 2003. Plaintiff explained that he "got into an argument with [his] kid's mother" and that she bit him on the wrist and then he "smacked her" and then the police arrived. R. 592.

After plaintiff testified, his girlfriend, Erin McCaslin, testified next, stating that she had known plaintiff for ten years and they had been living together for the last three years. She stated that plaintiff's bipolar depression put "stress on [their] relationship because [she has] to pick up all the slack as far as household duties and he isolates himself a lot so it puts stress on [her]." R. 596. She stated that plaintiff had anger outbursts "[p]robably two to three times a week." R. 596. He sometimes directed these outbursts against her. She stated that she did not believe plaintiff could work a full time jobs because "[s]ometimes" he wakes up "in a depressed mode and he can't get out of bed" and because he "doesn't work well with people" due to his "high temper." R. 597. She observed him having crying spells a couple of times a week.

On March 26, 2015, the ALJ found plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: "major depressive disorder; explosive disorder; posttraumatic stress disorder; and a history of alcohol and marijuana abuse." R. 555. The ALJ found that plaintiff could perform the full range of work but was limited in certain ways due to a "history of anger issues"—specifically, he could have no public contact, only occasional contact

3

with coworkers and supervisors, could not engage in "teamwork" situations, and could not work under hourly quotas. R. 559. The ALJ's rationales are discussed below.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

In this appeal, plaintiff raises the following four arguments: (1) the ALJ failed to include plaintiff's moderate limitations in concentration in the RFC formulation; (2) the ALJ failed to follow the treating physician rule; (3) the ALJ erred in finding that sufficient jobs existed in the national economy that plaintiff could work; and (4) the ALJ erred in analyzing plaintiff's

4

credibility. The Court will begin with the second argument because it casts the broadest scope and because it provides, by itself, a basis for remand.

**I.      Treating Physician Rule.**

Plaintiff argues that the ALJ should have given controlling weight to the opinion of his psychiatrist, Dr. Walter Pedemonte, who completed a form entitled "Mental Impairment Questionnaire (RFC & Listings)," dated the March 24, 2010 (the "report"). *See* Ex. 15F. Plaintiff argues that two specific conclusions from the report are especially relevant. One is Dr. Pedemonte's assessment that plaintiff had *marked* limitations in concentration (the ALJ found they were only moderate) and the other is that plaintiff had "three or more" episodes of decompensation (more discussion below on the meaning of this phrase). The parties seem to agree, although this point is not entirely clear, that if these conclusions were accepted, then the ALJ should have found that plaintiff was disabled.

One record-keeping point should be noted at the outset, although it was not addressed in the briefs. Dr. Pedemonte's report consists of two pages (numbered as pages 510 and 511 in the record on appeal), but the report is internally numbered as having four pages because the first of the two pages is numbered at the bottom as page one and the second page is numbered as page four. In other words, the second and third pages of the original form appear to be missing. This conclusion is confirmed by the questions and answers which do not make sense if the two pages are read as a continuous document. Neither the parties nor the ALJ have commented on this apparent discrepancy. But the missing pages (assuming they are missing and were not overlooked by Dr. Pedemonte and never completed by him) could be significant to the analysis. They might include further opinions or supporting explanations. In sum, clearing up this discrepancy would be yet another reason favoring a remand.

5

Turning to the merits, the ALJ gave Dr. Pedemonte's report "little weight." Here is the ALJ's explanation (in full):

> Dr. Pedemonte, claimant's psychiatrist at Ecker, also submitted a mental impairment questionnaire on March 24, 2010. He opined that the claimant had marked limitations in concentration, persistence or pace and that he has had three or more episodes of decompensation. These opinions are given little weight because the medical record does not support these limitations. The undersigned notes that a period of decompensation of extended duration lasts two weeks or longer per the regulations and the medical record does not indicate a single episode of decompensation that lasted two weeks or longer. Furthermore, marked limitations in concentration, persistence, and pace indicate more than moderate limitations in the claimant's ability to complete even simple tasks. The undersigned notes that the claimant's alleged daily activities alone support a finding that the claimant has less than marked limitations in concentration, persistence or pace. Dr. Pedemonte may be unfamiliar with the regulatory definitions of marked limitations and the requirements of periods of decompensation because his opinions are not supported by the medical evidence (Exhibit 15F). His opinion is also inconsistent with his own treatment notes dated both prior to and after his medical source statement. Claimant saw Dr. Pedemonte on October 5, 2009, and Dr. Pedemonte noted claimant was "co-operative," "psychomotorally stable" and "oriented to time, place, and person." On November 2009 Dr. Pedemonte indicated claimant was "psychomotorally stable" and his "insight and judgment [were] moderate." It was only at the December 30, 2009 [visit], that Dr. Pedemonte found claimant to be "psychomotorally retarded" and found his "attention, concentration, and calculation poor." Even then, he told the claimant to return in 8 weeks. By August 2010 (and November 2010) Dr. Pedemonte was back to describing the claimant as "psychomotorally stable" and his "mood and affect were fair." In his last session with Dr. Pedemonte in December 2010, claimant was described as psychomotorally stable with judgment and insight were improving. Claimant was told to return in three months.

R. 562. This paragraph contains three main arguments: (1) Dr. Pedemonte did not understand Social Security definitions, particularly the meaning of "episodes of decompensation"; (2) his opinion is at odds with plaintiff's daily activities; and (3) his own treatment notes do not support his bottom-line conclusions as evidenced by the findings regarding psychomotor stability.

The treating physician rule requires that a treating physician's opinion be given controlling weight if it is supported by medical findings and consistent with other substantial

6

evidence in the record. 20 C.F.R. §404.1527(c)(2); *Moore v. Colvin*, 743 F.3d 1118, 1127 (7th Cir. 2014). If the ALJ does not give it controlling weight, the ALJ cannot simply disregard it without further analysis. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). Instead, the ALJ must determine what specific weight, if any, the opinion should be given. *Moss v. Astrue¸* 555 F.3d 556, 561 (7th Cir. 2009). To make this determination, in step two, the ALJ must apply the checklist of factors set forth in 20 C.F.R. § 404.1527(c)(2). *Campbell*, 627 F.3d at 308 (referring to the factors as a "required checklist"); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).[2] Failure to apply checklist is reversible error. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (ALJ disregarded checklist); *Moss*, 555 F.3d at 561 ("the choice to accept one physician's opinions but not the other's was made by the ALJ without any consideration of the factors outlined in the regulations"); *Campbell*, 627 F.3d at 308 ("Here, the ALJ's decision indicates that she considered opinion evidence in accordance with [the checklist]. However, the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence."). In other words, ALJs must explicitly show their work.

Here, the ALJ did not follow this rule. First, at step one, the ALJ did not explicitly analyze whether Dr. Pedemonte's report should be given controlling weight. It is undisputed that he was a treating physician. The ALJ did not explicitly analyze (i) whether Dr. Pedemonte's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or (ii) whether it was consistent with the "other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2). This by itself is reversible error. *Clifford v. Apfel*, 227 F.3d 863,

---

[2] The factors are: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

870-71 (7th Cir. 2000) (reversing and remanding because the ALJ failed to determine whether the treating physician's findings were entitled to controlling weight).

Second, at step two, the ALJ did not refer to, or explicitly apply, the checklist factors. This point is not in dispute. The Government argues, however, that the ALJ essentially conducted an implicit analysis and that this is sufficient. However, this Court takes the view that an explicit analysis is still required. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). But even if the Court allowed an implicit analysis, the ALJ failed to properly apply the checklist. *See Koelling v. Colvin,* 2015 U.S. Dist. LEXIS 14074, *28-29 (N.D. Ill. Oct. 16, 2015).

The first two factors—length of treatment and the nature and extent of the treatment relationship—were not explicitly considered. The Government notes that the ALJ referred to Dr. Dr. Pedemonte's treatment notes both "prior to and after the date he issued his opinions in March 2010." Dkt. #21 at 7. More specifically, the Government defines this period as the 15-month period "from October 2009 through December 2010." *Id.* But this argument is unconvincing for several reasons. Unlike the Government, which at least provided the above statement attempting to summarize the time parameters of the treatment relationship, the ALJ never provided such a statement, nor did she tally up the total number of visits. These simple steps might seem unimportant but they provide helpful information as to the often complicated medical paper trail typically found in these cases. It is not this Court's job to parse through these many pages and extract this historical data. A related point is that the ALJ never summarized the specific treatment timespan and number of visits for the other medical providers on whom she relied. The first two checklist factors are most meaningful when they are applied in a comparison across the different medical providers the ALJ relied on or did not rely on.

More substantively, the Government's summary of the treatment timespan (from October 2009 – December 2010) appears to be inaccurate. As plaintiff notes, he continued to see Dr. Pedemonte *after* December 2010. Therefore, the ALJ's assertion that the December 2010 visit was plaintiff's "last session" is an error. R. 562. Plaintiff saw Dr. Pedemonte at least several more times, including visits in August 2011, September 2011, November 2011, April 2012, August 2012, October 2012, December 2012, February 2013, and April 2013. Dkt. #18 at 3, 14; Ex. 21F. That is a total of nine treatments the ALJ and Government ignore. At this point, it is not clear whether these additional records would necessarily lead to a different conclusion by themselves, but it is incumbent on the ALJ to review entire record.

A similar analysis applies to the fifth factor, degree of specialization. The ALJ merely referred in passing to the fact that Dr. Pedemonte was "claimant's psychiatrist at Ecker." R. 562. But the ALJ did not explicitly analyze the particular expertise of Dr. Pedemonte, nor consider whether his specialty deserved more weight than those of the other opinion providers such as Dr. Barbara Sherman whose opinion was given "great weight." Again, it may be that this factor, upon further analysis, does not change the ALJ's opinion, but it should be considered explicitly.

The remaining three factors—(3) supportability, (4) consistency, and (6) other factors— are more general and were addressed in some respects in the paragraph quoted above, but this analysis is still insufficient. This insufficiency can be seen by analyzing the ALJ's three reasons set forth therein. The first reason is that Dr. Pedemonte did not understand the Agency's definitions, in particular for "episodes of decompensation." The ALJ found that, contrary to Dr. Pedemonte's conclusion that plaintiff had three or more such episodes, "the medical record does not indicate a single episode of decompensation *that lasted two weeks or longer*." R. 562 (emphasis added). But this assertion, which is not followed by any explanation or discussion of

9

specific evidence, rests upon the questionable premise that Dr. Pedemonte's was applying the Agency's longer definition in the Section 12 mental health listings. Set forth below is a screen shot of the precise question Dr. Pedemonte answered, along with his answer:

> d. Episodes of deterioration or decompensation in work or work-like settings tat cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)
>
> Never    Once or twice    Repeated (three or more) Continual

R. 511. This provision does not include the qualification inserted by the ALJ that such episodes must last "two weeks or longer," and it does not even strictly limit the phrase to "episodes of decompensation," as it also refers to episodes of "deterioration." Moreover, to the extent there is doubt about what these phrases mean, this provision includes its own definition—namely, that such episodes would cause a person "to withdraw" from work or work-like settings *or* to experience "exacerbations of signs and symptoms." Thus, contrary to the impression created by the ALJ, there was no duration requirement on the form Dr. Pedemonte completed. It is unfair to fault Dr. Pedemonte for not correctly answering a question *different* from the one he was asked.

The ALJ may have assumed (again, without any textual basis) that the question was essentially trying to invoke the longer phrase "repeated episodes of decompensation, each of extended duration," which is set forth in paragraphs B and C of the Section 12 mental health listings. But even if true, the ALJ's reasoning is still questionable. As both this Court and the Seventh Circuit have observed, this phrase is "vague" and not "self-defining." *Larson v. Astrue*, 615 F.3d 744, 747, 750 (7th Cir. 2010). Section 12 sets forth the following explanation that includes a two-week time limitation:

> The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months,

10

> each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. As this passage notes, the two-week provision is not absolute and episodes of "shorter duration" may also qualify. Relying on this provision, the Seventh Circuit in *Larson* faulted the ALJ for overlooking this fact, finding that a "fair reading of the record" showed that the claimant's treating physician was essentially applying this alternative equivalency test when he checked the box indicating that the claimant had three or more episodes. 615 F.3d at 750. In short, the Seventh Circuit found that the ALJ took a "too narrow" view of the phrase "episodes of decompensation." This same concern is present here. Put differently, the ALJ's conclusion that Dr. Pedemonte "may be unfamiliar with the regulatory definitions" is not proven by these facts.

The ALJ's second reason for giving Dr. Pedemonte's report little weight is that plaintiff's daily activities supposedly did not support marked limitations in concentration, persistence, or pace. In the paragraph quoted above, the ALJ merely stated this conclusion and did not offer an explanation. However, earlier in the opinion, she discussed plaintiff's daily activities at more length. As plaintiff argues, and the Government does not seem to dispute, the "only activity" cited by the ALJ arguably relevant to concentration problems is plaintiff's alleged ability to care for his children. This point was mentioned repeatedly throughout the opinion, reflecting the large importance the ALJ placed on this one point.

Plaintiff argues that the ALJ cherry-picked the evidence to make his childrearing role appear larger than it really was. The Court agrees. The ALJ essentially portrayed plaintiff as a

11

full-time, active father taking care of many children over a many-year period.[3] But the evidence is mixed and it is not clear that the ALJ gave consideration to the counter-evidence. Plaintiff testified that he had a more limited role, consisting largely of filling in when his girlfriend was not able to do things, and even then his girlfriend's mother and sister came over to assist him. This more limited view is confirmed by plaintiff's testimony, his girlfriend's testimony, his mother's statement, and even the medical records. *See, e.g.*, R. 437 (Dr. Sherman's report: "He said *sometimes* he will take care of his 2-year-old and then spends the time in his room watching cartoons with the boy.") (emphasis added); R. 282-83 (plaintiff's mother stating that her son's children "are usually with their mothers" but that he would sometimes change his son's diaper and feed him when his son was with him); R. 283 (plaintiff's mother again: "He keeps 4 of his children sometimes, but he just pick[s] up after them. It's up to me or my husband to feed them.").

In addition to these factual arguments, plaintiff also points to the general concerns the Seventh Circuit has repeatedly expressed about ALJ's over-relying on claimant's daily activities such as taking care of children. *See* Dkt. #22 at 12-13; *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons [] and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). Although it

---

[3] *See, e.g.*, R. 557 ("The claimant currently participates in caring of an infant (8 weeks old at time of hearing) and admitted he can change diapers, make bottles and help bathe [the] child, thus, showing he can maintain a routine (feeding and changing schedule for the infant). Also, per Exhibits 4E, 1lE, 12E, [] the claimant has been capable of caring for young children for many years including dressing, feeding and diapering and/or picking up after them."); R. 563 ( "the claimant is apparently able to care for young children at home, *which can be quite demanding both physically and emotionally*") (emphasis added).

is true that the ALJ did recognize that plaintiff had some limitations in this area, on remand, the ALJ should consider all the relevant evidence in a more balanced way.

The ALJ's third reason is that Dr. Pedemonte's conclusions were undermined by his own treatment notes. This was the ALJ's longest and most fact-specific rationale. The ALJ referred to several visits before and after Dr. Pedemonte's March 2010 report. From the treatment notes of these visits, the ALJ picked out a few observations. The primary one was that at some of the visits, Dr. Pedemonte observed that plaintiff was "psychomotorally stable," and that on only one of the visits did he find that plaintiff was "psychomotorally retarded."

Plaintiff argues that the ALJ single-mindedly focused on this one metric and did so "based on her lay understanding of psychiatry as to how particular mental status indicators related to functional limitations." Dkt. #18 at 13 (citing *Schmidt v. Sullivan*, 914 F.23d 117, 118 (7th Cir. 1990) ("Common sense can mislead; lay intuitions about medical phenomena are often wrong")). This Court agrees. Reviewing the underlying source documents, it appears that the ALJ latched on to this one particular observation without explaining why it was the key factor over many others, or why it contradicted the bottom-line conclusions. For example, the third question on the report listed 32 possible signs and symptoms that could be checked off. One of them, which Dr. Pedemonte checked off, was "psychomotor agitation or retardation." R. 510. But Dr. Pedemonte also checked off 19 others, and there is nothing on the form indicating that this one observation was more significant than the others. Recognizing this problem, the Government in its response brief made a partial attempt to fill the gap by at least offering a definition of "psychomotor" taken from a medical dictionary. *See* Dkt. #21 at 7. But this definition is threadbare. The fact still remains that there was no medical expert who concurred with the ALJ's analysis of psychomotor stability. In sum, the ALJ's three rationales are vague

13

and contain several questionable assumptions. For all the above reasons, the Court finds that a remand is required under the treating physician rule.

**II.      Remaining Arguments**

Having found that a remand is required, the Court will address the remaining arguments only briefly, especially since they overlap in several respects with the points already discussed. Plaintiff's next strongest argument is that the ALJ, in her credibility finding, failed to adequately confront plaintiff's primary problem—his anger outbursts. *See* Dkt. #18 at 17 (the ALJ failed to explain whether "allegations of suffering outbursts of anger [were] credible or incredible").

The ALJ gave mixed signals on this issue. On the one hand, the ALJ found that one of plaintiff's severe impairments was "explosive disorder." The ALJ also referred in passing to a few of plaintiff's anger incidents and legal problems. In the RFC formulation, the ALJ acknowledged that plaintiff had a "history of anger issues" and imposed several conditions designed to address the issue. On the other hand, the ALJ glossed over or downplayed much of this specific evidence, arguably whitewashing its frequency and severity. Not surprisingly, the Government emphasizes the former point, and plaintiff the latter point.

The Court finds that, although the ALJ did not completely disregard this issue, the ALJ failed to consider the counter-evidence supporting plaintiff's theory that his anger problems were worse than portrayed by the ALJ. *Thomas v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) (an ALJ may not ignore a line of evidence contrary to his conclusion).

Several examples support the conclusion. Consider for example plaintiff's difficulties with his father. As plaintiff has testified, he "was physically abused by [his] father all throughout [his] childhood and up to today"; his dad would drink and then "would want to fight [plaintiff]"; and plaintiff and his dad got into a fight resulting in plaintiff breaking his hand by hitting the refrigerator R. 581, 584, 593-94. This evidence points to ongoing conflict between plaintiff and his father.

14

However, the ALJ obscured these facts. Earlier in the opinion, the ALJ referred in passing to plaintiff's injury "when punching the refrigerator," but left out that it occurred in a fight with his father. Then, later in the analysis of plaintiff's daily activities, the ALJ pointed to the fact that plaintiff "visits his father and plays Wii" as a reason for finding plaintiff's difficulties in social functioning were not severe, all the while leaving out that during these same visits the two men were getting into physical fights.

The ALJ also suggested that these anger outbursts were confined to plaintiff's paranoia of the Elgin police departments. But this interpretation glosses over anger incidents involving a broader range of people, not limited to the police. For example, plaintiff was involved in an incident where he threw a piece of equipment at a work supervisor; he was referred to a domestic violence program for assaulting the mother of his children; he regularly had anger episodes (several times a week) with his current girlfriend; he was "uncooperative and violent" with emergency room staff in 2005; he assaulted a neighbor; he had a dispute at a family gathering; and he had a dispute with his landlord. Dkt. #18 at 18-19; R. 286, 410, 488, 519, 590, 592, 596.

Moreover, the ALJ only gave a passing nod to the fact that his healthcare providers (including Sherman, Harris, and Pedemonte) all agreed that he had ongoing anger problems leading to conflicts and violence. For example, Dr. Sherman, whose opinion was given great weight by the ALJ, stated the following in her report: "He acknowledges getting angry easily. During these times he yells, breaks furniture, punches the wall and throws glasses. He said that he will hit himself on the head. He also has a loss of memory for what he does during those times and is only told afterwards what his behavior was." R 437. Again, the ALJ's opinion leaves out these details or only briefly alludes to them in a sanitized way.

15

In its brief, the Government defends the ALJ's reasoning by noting that the ALJ justifiably found that medication controlled the anger problem sometime around 2011, but this conclusion needs further analysis to be upheld. In particular, this theory must acknowledge the counter-evidence, including the incidents and fights summarized above. On remand, the ALJ should confront this evidence more directly.

Plaintiff raises another valid credibility-based argument, which is his claim that the ALJ failed to consider that his sporadic treatment history may have been a result of his mental illnesses, including his paranoia. *See generally Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."). The ALJ should explicitly consider this possibility on remand if the ALJ intends to rely on treatment gaps as reason for discounting plaintiff's credibility.

Finally, as for plaintiff's two other arguments, one is that the ALJ erred in failing to account for plaintiff's moderate limitations in concentration in the formulating the RFC. The Government argues in response that the ALJ properly relied on the opinion of the state agency consultant, Dr. Hudspeth, who found that plaintiff, in fact, had moderate limitations in several areas of concentration, persistence, or pace. *See* Ex. 9F; R. 460. In his reply, plaintiff points to a separate document where Dr. Hudspeth listed plaintiff's limitations in this area as mild. *See* Ex. 8F; R. 456. This apparent contradiction should be reconciled on remand. The other remaining argument is that there was a conflict between the testimony of the Vocational Expert and the

Dictionary of Occupational Titles.  Here again, this is an issue that the ALJ can address on remand after first addressing the issues described above, which will require new testimony from a vocational expert in any event.  In remanding this case, this Court is not directing a particular result, only that the ALJ fully consider all the issues discussed herein.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date:  December 6, 2016        By:     _____
                                                   Iain D. Johnston
                                                   United States Magistrate Judge